**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 31, 2007**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

CHARLES BEEN, individually and d/b/a
Creekside Farm, Inc.; DONALD FROST;
EDWIN JOHNSTON; BOB FIELDS,
individually and dba Okie Blue Sky Farm,
Inc.; GENE BLACKWELL, Class
Representatives,

    Plaintiffs - Appellants,

      v.

O.K. INDUSTRIES, INC.; O.K. FOODS,
INC.; O.K. FARMS, INC., all Arkansas
corporations, individually and as
administrators of health and benefit plans;
O.K. BROILER FARMS LIMITED
PARTNERSHIP, an Arkansas limited
partnership, individually and as
administrator of health and benefit plans;
COLLIER WENDEROTH, JR.;
RANDALL GOINS; TOM WEBB,
individually and as trustees of health and
benefit plans; OK INDUSTRIES, INC.
EMPLOYEE BENEFIT PLAN; OK
INDUSTRIES, INC. EMPLOYEE
FUNDED GROUP HEALTH CARE
PLAN; OK INDUSTRIES, INC. AND ITS
SUBSIDIARIES EMPLOYEE FUNDED
HEALTH CARE PLAN; OK
INDUSTRIES, INC. AND AFFILIATES
FLEXIBLE BENEFITS/HEALTH CARE
PLAN; OK INDUSTRIES, INC. AND
AFFILIATES FLEXIBLE BENEFITS
PLAN; RETIREMENT SAVINGS PLAN
OF OK INDUSTRIES, INC. AND

No. 05-7079

SUBSIDIARIES; RETIREMENT
SAVINGS PLAN OF OK INDUSTRIES,
INC.; GROUP LONG TERM
DISABILITY PLAN; GROUP LIFE
HEALTH INSURANCE PLAN; GROUP
VOLUNTARY TERM LIFE INSURANCE
PLAN; KEN PRIMM,

Defendants - Appellees.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA
(D. Ct. No. 02-CV-285-W)**

---

Charles B. Goodwin and Harry A. Woods, Jr. (Mack J. Morgan, III, Christopher B. Woods, and Amanda L. Maxfield, with them on the briefs), Crowe & Dunlevy, P.C., Oklahoma City, Oklahoma, appearing for the Appellants.

Matthew Horan, Smith, Maurras, Cohen, Redd & Horan, PLC, Fort Smith, Arkansas (James M. Sturdivan and Ronald N. Ricketts, Gable & Gotwals, P.C., Tulsa, Oklahoma, and Don A. Smith, Smith, Maurras, Cohen, Redd & Horan, PLC, Fort Smith, Arkansas, with him on the briefs), appearing for the Appellees.

---

Before **TACHA**, Chief Circuit Judge, **BRISCOE**, and **HARTZ**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

This appeal presents a matter of first impression for this Circuit, namely whether § 202(a) of the Packers and Stockyards Act ("PSA"), 7 U.S.C. § 181 et seq., requires a plaintiff to prove that an allegedly "unfair practice" injures or is likely to injure competition. The District Court held that such proof is required

-2-

and, finding that the Plaintiffs had failed to present any evidence of a competitive injury, granted summary judgment in favor of the Defendants. The court also granted the Defendants' motion for summary judgment on the Plaintiffs' state law claim of unconscionability. We take jurisdiction under 28 U.S.C. § 1291, and for the reasons that follow, we affirm in part and reverse in part, remanding to the District Court for further proceedings consistent with this opinion.

## I. BACKGROUND

Defendants-Appellants OK Industries, OK Farms, Inc., and OK Foods, Inc. (collectively "OK") constitute a vertically integrated poultry producer operating in Arkansas and Oklahoma. OK is involved in almost every stage of the production and wholesale of poultry and poultry products: it breeds, hatches, provides feed for, transports, slaughters, and processes poultry. One aspect of poultry production OK does not handle is the raising of broiler chickens to slaughtering age. OK enters into contracts with various "growers" who handle that part of the production process.

The Plaintiffs-Appellants ("Growers") are a class of growers operating in Oklahoma under contract with OK. In addition to alleging that the process by which OK and its growers enter into contracts is unconscionable under Arkansas law, the Growers argue that the terms of the contracts, as well as OK's performance under the contracts, violate the Packers and Stockyards Act, 7 U.S.C. § 181 et seq. Their claims hinge on the following undisputed facts.

-3-

OK is the largest poultry integrator in Oklahoma. With limited exceptions, no other integrators operate in the geographic markets in which OK operates. At the time of this lawsuit, OK had a waiting list of over 130 persons desiring to become growers for OK or to expand their existing operations. When OK needs to expand its production, it contacts persons on the waiting list to determine whether they are still interested, and if so, whether they will be suitable growers. Prior to entering into a contract with a grower, OK requires the grower to first obtain financing and build chicken houses to specifications set by OK. In exchange for a grower's expenditure of money to build the requisite chicken houses, OK signs a letter of intent, agreeing to enter into a broiler contract with the grower upon satisfactory completion of the chicken houses. One chicken house can cost a grower nearly $160,000, not including the cost of land and equipment.

All the broiler contracts are materially identical; they are standard contracts drafted by OK and are not subject to negotiation. Under the standard contract, a grower agrees to use only chicks, feed, and medicine supplied by OK. OK is not liable, however, for any loss a grower incurs as a result of OK's failure to provide feed and supplies; nor is OK liable for birds condemned due to certain diseases. The contract also provides that a grower may not sell its chickens to poultry integrators other than OK and may not transfer its broiler contract to other potential growers without OK's prior approval. Under the terms of the contract,

OK agrees to provide the grower with only one flock of chicks, which typically takes a grower seven weeks to raise.[1]  Thereafter, OK may provide the grower with replacement flocks "from time to time."  In addition to deciding when to deliver replacement flocks, OK determines the breed of chicken, the number of chicks per flock, and the number of flocks.  Furthermore, at the end of each growing cycle, OK may require that a grower update its houses to meet OK's most recent specifications before it will place another flock of chicks with the grower.  These required changes result in significant costs to growers.

The contract also details the method OK uses to calculate a grower's pay. OK uses a "competitive ranking" system to reward growers who produce chickens at the least cost to OK.  Under OK's system of payment, OK first calculates the production cost per pound[2] of each grower's flock and labels this production cost the grower's "flock prime cost."  It then lists the flock prime cost of each grower in order from lowest to highest.  The flock prime cost of the grower that is numerically in the middle of the list is designated as the "average prime cost."  If any individual grower's flock prime cost is less than the average prime cost, then OK pays that grower a higher rate per pound than those whose flock prime cost is

---

[1] Because of the large capital commitments needed to become a grower for OK, growers must typically raise chickens for fifteen to twenty-five years to recover their initial investment.

[2] The production cost per pound takes into account the weight of the chickens raised by growers, as well as the cost for chicks, medicine, and feed.

higher than the average prime cost. In other words, a grower's pay is based on how growers in a group rank against each other, not on the individual grower's production.

The Growers in this case filed suit in the United States District Court for the Eastern District of Oklahoma. They obtained class certification to challenge the following conduct: (1) OK deducts from the Growers' pay certain charges for medicine and supplies; (2) OK sometimes delivers dead chicks to the Growers and causes the Growers to pay for them because OK counts chicks to be delivered at the hatchery, rather than at the Growers' premises; and (3) OK has reduced the number of birds placed per year with the Growers, causing a substantial decrease in the Growers' income. The Growers also challenged OK's competitive ranking system, arguing it is unfair and unconscionable because (1) OK uses the median flock prime cost as the average prime cost, which alters the rankings in a way that benefits OK to the detriment of the Growers; (2) OK exercises control over factors affecting the Growers' performance; and (3) OK calculates the weight of condemned birds, for which OK will not pay Growers, based on the weight of healthy birds, even though condemned birds can weigh up to 50% less than healthy birds. The Growers alleged that OK's conduct constitutes a breach of contract and violates § 202(a) of the PSA, 7 U.S.C. § 192(a). They also alleged that the broiler contract is unconscionable and therefore unenforceable under state law.

OK moved for judgment on the pleadings, arguing, *inter alia*, that proof of an injury to competition is a required element of a claim brought under § 202(a) of the PSA. The district court judge denied OK's motion, holding that § 202(a) does not require proof of an injury to competition. Approximately eighteen months later, in a motion for summary judgment before a different district court judge, OK re-raised the issue. The Growers argued that the doctrine of the law of the case bound the District Court to its prior ruling and that § 202(a) did not require proof of an injury to competition. In the alternative, they argued that they had presented sufficient evidence of an injury to competition to withstand summary judgment. The court disagreed with all three arguments. After concluding that the law of the case did not bind the court to the prior ruling, the District Court held that § 202(a) requires proof that a practice injures or is likely to injure competition and that the Growers had failed to establish a genuine issue of material fact concerning competitive injury. Consequently, the court entered summary judgment in favor of OK on the Growers' PSA claim. The Growers then moved to reopen discovery for the purpose of determining whether OK's conduct injured or was likely to injure competition. The District Court denied the motion.

Subsequently, in response to a motion filed by the Growers for an interlocutory appeal, the District Court supplemented its summary judgment ruling disposing of the PSA claim. It held that, even if § 202(a) does not require

a competitive injury, whether particular conduct is "unfair" within the meaning of § 202(a) is a question of law, and OK's conduct in this case was not "unfair" as a matter of law.

In yet another order, the District Court entered summary judgment in favor of OK on the Growers' unconscionability claim. With respect to the broiler contracts governed by Oklahoma law,[3] the court concluded that Oklahoma would not recognize an affirmative claim for damages based on unconscionability. With respect to the broiler contracts governed by Arkansas law, the court concluded that, although Arkansas recognizes an affirmative cause of action for unconscionability, the Arkansas courts have not specifically addressed an affirmative claim for damages, and in any event, these contracts were not unconscionable under Arkansas law.

Following these rulings, the parties settled the pending class claims for breach of contract. The Growers now appeal the District Court's rulings on their PSA and unconscionability claims.

## II. DISCUSSION

A.    The Packers and Stockyards Act § 202(a)

1.    Law of the Case

---

[3]Beginning in 1997, OK's broiler contracts included a choice-of-law provision designating the law of Arkansas as the governing law. The District Court therefore applied Arkansas law to those contracts and Oklahoma law to the contracts pre-dating 1997.

The Growers first contend that the District Court's initial ruling that § 202(a) does not require proof of an injury to competition represents the law of the case, which should not be disturbed except in very narrow circumstances not present here. We disagree. Generally, the "law of the case" doctrine dictates that prior judicial decisions on rules of law govern the same issues in subsequent phases of the same case. *See Homans v. City of Albuquerque*, 366 F.3d 900, 904 (10th Cir. 2004). We have acknowledged, however, that "the rule is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power." *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 823 (10th Cir. 2007) (internal citation omitted). That is, the doctrine is merely a "presumption, one whose strength varies with the circumstances." *Avitia v. Metro. Club of Chicago, Inc.*, 49 F.3d 1219, 1227 (7th Cir. 1995); *see also Homans*, 366 F.3d at 904 ("[T]he doctrine is discretionary rather than mandatory."). If the original ruling was issued by a higher court, a district court should depart from the ruling only in exceptionally narrow circumstances. *See McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000).[4] On the other hand, district courts

[4] This Court had recognized three "exceptionally narrow" grounds supporting a district court's departure from an appellate court's earlier ruling: "(1) when the evidence in a subsequent trial is substantially different; (2) when controlling authority has subsequently made a contrary decision of the law applicable to such issues; or (3) when the decision was clearly erroneous and would work a manifest injustice." *McIlravy*, 204 F.3d at 1035 (quotation

(continued...)

generally remain free to reconsider their earlier interlocutory orders. *Harlow v. Children's Hosp.*, 432 F.3d 50, 55 (1st Cir. 2005); *see also United States v. Smith*, 389 F.3d 944, 949 (9th Cir. 2004) (explaining that a district court may review its prior rulings so long as it retains jurisdiction over the case).

Finding no Supreme Court or Tenth Circuit authority interpreting § 202(a) to require proof of a competitive injury, the first district court judge denied OK's motion for judgment on the pleadings. In reviewing OK's motion for summary judgment eighteen months later, however, the second judge found persuasive authority from other circuits holding that such proof is required. In light of these circumstances and the interlocutory nature of the initial ruling, the District Court did not abuse its discretion in reconsidering the prior ruling. *See Harlow*, 432 F.3d at 55–56 (reviewing a district court's reconsideration of a prior interlocutory order for abuse of discretion).

2. Interpretation of "Unfair Practices" under § 202(a)

Section 202 of the PSA makes it unlawful for a "live poultry dealer"[5] to

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

---

[4](...continued) omitted).

[5] It is undisputed that OK is a "live poultry dealer," defined as "any person engaged in the business of obtaining live poultry by purchase or under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." 7 U.S.C. § 182(10).

(b) Make or give any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; or

(c) Sell or otherwise transfer to or for any other packer, swine contractor, or any live poultry dealer, or buy or otherwise receive from or for any other packer, swine contractor, or any live poultry dealer, any article for the purpose or with the effect of apportioning the supply between any such persons, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly; or

(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce; or

(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business, or (2) to apportion purchases or sales of any article, or (3) to manipulate or control prices; or

(g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a), (b), (c), (d), or (e) of this section.

7 U.S.C. § 192.

At issue in this case is only what constitutes an "unfair" practice within the meaning of § 202(a). The District Court held that an "unfair" practice is one that "injures or is likely to injure competition." The Growers contend that this

-11-

interpretation of the statute is belied by the United States Department of Agriculture's ("USDA") interpretation, as well as the statute's plain language and purpose.

We first address the Growers' suggestion that we must defer to the USDA's reasonable interpretation of the statute because the agency is authorized to make rules and regulations necessary to carry out the PSA. *See Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984) (holding that when Congress has implicitly delegated legislative authority to an agency, "a court may not substitute its own construction of a statutory provision for a reasonable interpretation made by the administrator of an agency"). To that end, the Growers claim that the USDA "has consistently taken the position that in order to prove that any practice is 'unfair' under [§] 202(a) . . . of the Act, it is not necessary to prove predatory intent, competitive injury, or likelihood of injury; and that it is the Department's duty to stop unlawful practices in their incipiency prior to actual injury." *In re Ozark County Cattle Co., Inc.*, 49 Agric. Dec. 336, 365 (1990), 1990 WL 320312. They also note that the USDA filed an amicus brief before the Eleventh Circuit in *London v. Fieldale Farms Corp.,* 410 F.3d 1295 (11th Cir. 2005), *cert. denied*, 126 S.Ct. 752 (2005), stating that the Secretary of Agriculture's position is that the PSA prohibits all unfair practices, regardless of whether a practice causes a competitive injury.

Although we generally defer to an agency's interpretation of an ambiguous

statute that it implements, "[d]ifferent types of agency pronouncements are entitled to different degrees of deference." *Newton v. FAA*, 457 F.3d 1133, 1136 (10th Cir. 2006).  As the Supreme Court has explained:

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority.  Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

*United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001).

Regulations promulgated by an agency exercising its congressionally granted rule-making authority are clearly entitled to *Chevron* deference.  *Newton*, 457 F.3d at 1137.  So too is an agency's adjudication of matters over which it has the authority to adjudicate, as such decisions carry the force of law.  *See id.*; *Southern Ute Indian Tribe v. Amoco Prod. Co.*, 119 F.3d 816, 832 (10th Cir. 1997) (recognizing the rule that an agency "may establish binding policy either through rule-making procedures or through adjudications that create binding precedents" (quotation omitted)), *rev'd on other grounds*, *Amoco Prod. Co. v. Southern Ute Indian Tribe*, 526 U.S. 865 (1999).  Here, however, the Secretary has not promulgated a regulation applicable to the practices the Growers allege violate § 202(a), and the USDA has no authority to adjudicate alleged violations of § 202 by live poultry dealers.  *See London*, 410 F.3d at 1304 (citing

-13-

administrative complaint procedures under 7 U.S.C. § 193(a)); *Jackson v. Swift Eckrich, Inc.*, 53 F.3d 1452, 1456–57 (8th Cir. 1995) (holding that the only means of enforcing § 202 against live poultry dealers is to file suit in federal district court under § 308, 7 U.S.C. § 209(a)).[6]  Moreover, we afford the USDA's position as stated in its amicus brief before the Eleventh Circuit little to no deference.  *See Shikles v. Sprint/United Mgmt. Co.*, 426 F.3d 1304, 1315 (10th Cir. 2005) ("[A]micus briefs . . . do not reflect the deliberate exercise of interpretive authority that regulations and guidelines demonstrate." (quotation omitted)).  The agency's views so stated "may be accepted by a court only as they have power to persuade." *First Am. Kickapoo Operations, L.L.C. v. Multimedia Games, Inc.*, 412 F.3d 1166, 1174 (10th Cir. 2005) (citing *Skidmore v. Swift*, 323 U.S. 134, 140 (1944)).  As we explain below, we are not persuaded by the USDA's interpretation of the statute.[7]

---

[6] Under 7 U.S.C. § 209, any person subject to the PSA may be held liable for damages.  Liability may be enforced either by complaint to the Secretary of Agriculture "as provided in section 210 of this title," or through proceedings instituted in federal district court.  7 U.S.C. § 209(b).  Under 7 U.S.C. § 210, however, only stockyard owners, market agencies, and dealers (not including live poultry dealers) may be found liable in proceedings before the Secretary of Agriculture.  In addition, the Secretary may issue cease and desist orders and assess civil penalties against packers and swine contractors, but not poultry dealers, under 7 U.S.C. § 193.  In other words, the Secretary has no adjudicative authority over live poultry dealers.  Hence, the only way to enforce § 202 of the PSA against a live poultry dealer is to file suit in federal district court under 7 U.S.C. § 209.

[7] In addition, we emphasize that we are interpreting the meaning of

(continued...)

-14-

Having concluded that we need not defer to the agency's interpretation of the statute, we turn to the District Court's construction of § 202(a). We review issues of statutory construction de novo, "interpret[ing] the words of the statute in light of the purposes Congress sought to serve." *Wright v. Fed. Bureau of Prisons*, 451 F.3d 1231, 1233–34 (10th Cir. 2006) (quotation omitted). In so doing, we begin with "the language employed by Congress," and we "read the words of the statute in their context and with a view to their place in the overall statutory scheme." *Id.* at 1234 (quotation omitted).

As the Growers note, nothing in the plain language of § 202(a) indicates that a practice is unfair only if it adversely affects competition or is likely to do so. But neither does the statute otherwise define an unfair practice. Enacted in 1921, the "primary purpose of [the PSA] is to assure fair competition and fair trade practices in livestock marketing and in the meatpacking industry" and "to safeguard farmers . . . against receiving less than the true market value of their

---

[7](...continued)
unfairness solely in the context of the PSA. Consequently, the Supreme Court's decision in *FTC v. Sperry and Hutchinson Co.*, 405 U.S. 233 (1972), which addresses similar language in § 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1), does not dictate a particular interpretation in this case. Unlike the case before us, the question in *Sperry and Hutchinson* was one of agency jurisdiction, namely whether § 5 empowered the FTC to define "unfair practices" to include practices without anticompetitive effects and of a noncompetitive nature. *Id.* at 239. Conversely, as we note above, the present case does not involve the USDA's interpretive or enforcement authority under the statute. Instead, we are faced with the task of construing a statute that only the federal courts may enforce against live poultry dealers.

-15-

livestock." H.R. Rep. No. 85-1048, at 1 (1957), *reprinted in* 1958 U.S.C.C.A.N. 5213, 5213. The "chief evil" Congress feared was the monopolistic practices of the packers, "enabling them unduly and arbitrarily to lower prices to the shipper, who sells, and unduly and arbitrarily to increase the price to the consumer, who buys." *Stafford v. Wallace*, 258 U.S. 495, 514–15 (1922). Although intended to be broader than antecedent antitrust legislation, § 202 "nonetheless incorporates the basic antitrust blueprint of the Sherman Act and other pre-existing antitrust legislation." *De Jong Packing Co. v. USDA*, 618 F.2d 1329, 1335 n.7 (9th Cir. 1980).

Against this backdrop, other circuits have concluded that "unfair[ness]" under § 202(a) requires evidence that the challenged practice will likely lead to a competitive injury. The issue is most thoroughly treated in *Armour & Co. v. United States*, 402 F.2d 712 (7th Cir. 1968). *Armour* involved a meat packer's coupon promotion, which allegedly had the effect of diverting sales from competitors to the defendant. After recognizing the PSA's ancestry in antitrust law, where Congress has expressed a "basic public policy distinguishing between fair and vigorous competition on the one hand and predatory or controlled competition on the other," *id.* at 717, the court reasoned that the "fact that a given provision does not expressly specify the degree of injury or the type of intent required, does not imply that these basic indicators of the line between free competition and predation are to be ignored," *id*. Even though the test of

unfairness under § 202(a) is "less stringent than under some of the anti-trust laws," the court still concluded that the coupon program at issue could not violate § 202(a) "absent some predatory intent or some likelihood of competitive injury." *Armour*, 402 F.2d at 717;[8] *see also IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999)) (concluding that the challenged conduct did not "potentially suppress or reduce competition sufficient to be proscribed by the [PSA]"); *Parchman v. USDA*, 852 F.2d 858, 864 (6th Cir. 1988) ("[The PSA] does not require that the Secretary prove actual injury before a practice may be found unfair. The Secretary need only establish the likelihood that an arrangement will result in competitive injury to establish a violation." (alterations, internal quotation marks, and citation omitted)); *DeJong*, 618 F.2d at 1337 (holding that "unfair practices under § 202 are not confined to those where competitive injury has already resulted, but includes those where there is a reasonable likelihood that the purpose will be achieved and that the result will be an undue restraint of competition").

In a more recent case, based on facts similar to those at issue here, the Eleventh Circuit similarly held that a claim brought under § 202(a) required some showing of a competitive injury or the likelihood of competitive injury.

_____

[8] We are not concerned here with predatory intent on the part of OK. That issue was not raised by the parties, and we therefore express no opinion on whether evidence of predatory intent can make an act "unfair" when there is no concomitant showing of a likelihood of competitive injury.

*London*, 410 F.3d at 1303. Like the case before us, *London* involved a vertically integrated poultry company that entered into contracts with growers to raise broiler chickens. *Id.* at 1298–99. One grower filed suit against the company, arguing that the company violated the PSA when it terminated his broiler contract. *Id.* at 1299. After a jury returned a verdict in favor of the grower, the district court set aside the verdict and granted the defendant's motion for judgment as a matter of law. *Id.* at 1300. Relying in part on *Armour*, the Eleventh Circuit held that to prevail under § 202(a), a plaintiff must show that the defendant's practice "adversely affects competition or is likely to adversely affect competition." *Id.* at 1304. In reaching this decision, the court identified the policy implications of a contrary holding: "Eliminating the competitive impact requirement would ignore the long-time antitrust policies which formed the backbone of the PSA's creation. Failure to require a competitive impact showing would subject dealers to liability under the PSA for simple breach of contract . . . ." *Id.*

The Growers argue, however, that because § 202's other subsections contain language prohibiting acts that tend to restrain commerce or create monopolies, *see, e.g.*, 7 U.S.C. § 192(c), (d), (e), the absence of similar language in § 202(a) conclusively means that proof of a competitive injury is not required. We disagree. Unlike subsections (c), (d), and (e), which list specific acts that are unlawful only when they have the tendency or effect of restraining commerce or

creating a monopoly, subsection (a) is a general prohibition on "unfair, unjustly discriminatory, or deceptive practice[s]" and provides no further guidance on what type of act falls within its parameters. Not to require a showing of competitive injury or the likelihood thereof would make a federal case out of every breach of contract. Nothing in the PSA suggests that Congress intended this result.

The Growers also argue that because other subsections require proof of a competitive injury, limiting subsection (a) to anticompetitive acts would render it superfluous and would therefore violate one of the "cardinal principle[s] of statutory construction" to "give effect, if possible, to every clause and word of a statute." *Williams v. Taylor*, 529 U.S. 362, 404 (2000) (quotation omitted). To the contrary, such an interpretation is far from rendering subsection (a) superfluous because it serves as a catchall for acts that Congress could not, at the time of enactment, have foreseen and specified. *Cf. Excel Corp. v. USDA*, 397 F.3d 1285, 1293 (10th Cir. 2005) (recognizing that new techniques and tools utilized by covered entities can violate the PSA even if the USDA has not previously declared them unlawful). While the other subsections make certain acts explicitly unlawful, Congress acknowledged with subsection (a) that it could not list the full panoply of unfair, unjustly discriminatory, or deceptive practices or devices that a covered entity might utilize.

Although we have never expressly held that unfairness under § 202(a)

-19-

requires a likelihood of injury to competition, our circuit precedent is not to the contrary. In resolving unfairness cases, we have often suggested that a showing of competitive injury can be determinative. In *Capitol Packing Co. v. United States*, 350 F.2d 67 (10th Cir. 1965), for example, we reviewed a decision issued by the USDA's Judicial Officer that various practices engaged in by the defendants violated § 312(a) of the PSA, 7 U.S.C. § 213(a), "which makes it unlawful for any market agency to engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in connection with the marketing or selling of livestock." *Capitol Packing Co.*, 350 F.2d at 73 (quotation omitted). The Judicial Officer found that a practice called "order buying" (i.e., the sale of livestock before it arrives at the stockyards) violated the PSA because the livestock had the misleading appearance of being for sale to the highest bidder by virtue of its presence in the market. *Id.* at 74. But this Court concluded, as a matter of law, that "order buying" was not a violation of § 312(a) in part because the record lacked "evidence . . . tending to show [order buying] *lessens competition*." *Id.* (emphasis added).

In *Excel Corp. v. USDA*, 397 F.3d 1285 (10th Cir. 2005), we reviewed the USDA's determination that Excel violated § 202(a) and one of the PSA's implementing regulations, 9 C.F.R.§ 201.99(a), by failing to disclose to hog producers a change in its formula for computing the weight of carcasses. Although it admitted that it had changed the formula, the meat packer argued that

it had not violated the act because, *inter alia*, "practices are not violative where they are required by the exigencies of the business." *Excel Corp.*, 397 F.3d at 1293. We rejected this claim, stating that "Congress and the USDA are the arbiters of what practices will *impede competition*." *Id.* (emphasis added). Hence, "the fact that a particular act is 'required by the exigencies of the business' . . . has no impact on whether that act is violative of the [PSA] and the implementing regulations." *Id.* By failing to notify hog producers of the changed formula, Excel prevented the producers from shopping their hogs to other packers to determine if they could obtain a better price. In light of these facts, we upheld the Judicial Officer's conclusion that Excel's practice "impeded competition." *Id.* at 1294.

In *Hays Livestock Commission Co. v. Maly Livestock Commission Co.*, 498 F.2d 925, 929 (10th Cir. 1974), we reviewed the Secretary of Agriculture's determination that a dealer's refusal to honor a draft to pay for livestock was "unjust and unreasonable" under 7 U.S.C. § 208. In upholding the Secretary's decision, we did not discuss what a plaintiff must show to establish that a practice is unjust or unreasonable, but we did note that "dishonoring of drafts in this context . . . placed an inordinate burden on the barns, contrary to the purpose of the Packers and Stockyards Act *to secure the free and unburdened flow of livestock*." *Hays Livestock Comm'n*, 498 F.2d at 932 (emphasis added) (quotation omitted). Like our decisions in *Capitol Packing Co.* and *Excel Corp.*, our opinion

in *Hays Livestock Commission* indicates that an impediment to competition, though never expressly required, was implicit in our prior decisions.

The Growers note, however, that we have also resolved cases under § 202(a) without any mention that the relevant practice injures competition. They direct our attention to *Peterman v. USDA*, 770 F.2d 888 (10th Cir. 1985), in which we upheld the Secretary's determination that a meat packer was guilty of deceptive trade practices, including its "bait and switch" tactic, whereby the packer would advertise one product and then convince customers seeking the product to buy a more expensive one instead. *Id.* at 890. To the extent our silence on the competitive injury requirement is relevant, this case is distinguishable because it involved an act alleged to be deceptive, as opposed to unfair. We are concerned here only with whether unfairness requires a showing of a likely injury to competition, not whether deceptive practices require such a showing. We therefore join the those circuits requiring a plaintiff who challenges a practice under § 202(a) to show that the practice injures or is likely to injure competition.

3.      OK's Alleged Violations of § 202(a)

After determining that § 202(a) requires proof of an injury or likely injury to competition, the District Court concluded that the Growers had failed to raise a genuine issue of material fact regarding competitive injury. We review the District Court's grant of summary judgment de novo, *Bryant v. Farmers Ins.*

*Exch.*, 432 F.3d 1114, 1124 (10th Cir. 2005), and will affirm its decision only if the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In reviewing the record, "we must view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." *Bryant*, 432 F.3d at 1124.

In granting summary judgment in OK's favor, the District Court held:

> To prove monopoly power typically requires the wilful acquisition or maintenance of such power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident. Monopoly power includes power to exclude competition. Plaintiffs have not presented evidence demonstrating entry barriers or other circumstances which improperly preclude other integrators from competing in this market with defendants. The mere fact that the defendants are the sole integrator does not demonstrate an illegal monopsony. Moreover, the plaintiffs are <u>not</u> competitors of defendants. Thus, injury to them by the allegedly "unfair" contract does not demonstrate injury to competition.

(internal citations omitted). The Growers argue that the District Court erred because it implied that (1) an injury to competition only arises in the context of unlawful monopolization; and (2) an injury to competition only arises when a competitor is injured.

We agree that the District Court erred in its legal analysis of what constitutes a competitive injury under § 202(a). As we noted above, Congress intended the PSA to have a broader scope than the antitrust laws. The antitrust

-23-

requirement that monopoly power be acquired willfully and include the power to exclude competitors does not apply in the context of the PSA. By holding that § 202(a) requires proof that a practice has injured or is likely to injury competition, we have not required a showing that the defendant engaged in the unfair practice with the intent to cause the injury or other unlawful effect.[9] Instead, the Growers need only prove that specific practices have the *effect* of injuring competition or are likely to do so. Moreover, as we explain below, when analyzing whether a buyer's "monopsony" power injures competition, as in this case, the inquiry is somewhat different from the inquiry into whether a seller's monopoly power injures competition.

The record contains evidence that supports the Growers' contention that OK is a monopsony in the relevant regional market. A monopsony is "a condition of the market in which there is but one buyer for a particular commodity." *Telecor Commc'ns, Inc. v. Sw. Bell Tel. Co.*, 305 F.3d 1124, 1133 n.4 (10th Cir. 2002) (quotation omitted). Because the poultry market is vertically integrated, if OK is the only integrator in the area, as the Growers suggest, it may constitute a monopsony. The District Court's characterization of this logic as a "non sequitur" is therefore incorrect. We have previously acknowledged that a

---

[9] Indeed, we have recognized that § 202(a) focuses on conduct and does not require proof of wrongful intent: "Nothing in the language of [§ 202(a)] . . . requires a showing of wrongful intent. To the contrary, the focus is solely on the acts committed or omitted." *Excel Corp.*, 397 F.3d at 1294.

monopsony may exist when sellers are unable to find alternative buyers and must sell to a single purchaser. *Id*. at 1135–36.

Furthermore, we have acknowledged that, like a monopoly, a monopsony can threaten competition. *Id*. at 1135 ("Economists . . . have long recognized that market inefficiencies created by anticompetitive restraints on input markets can be as destructive of a free market economy (and therefore ultimately damaging to consumers) as restraints on output markets."). According to economists, without competition from other buyers, a monopsonist will lower prices paid to sellers, which over time results in higher consumer prices.[10] In other words, a poultry processor with monopsony power can fix and manipulate prices resulting in injury to both poultry producers (i.e., growers) and end-users (i.e., consumers). We explained why depression of prices potentially injures both producers and consumers in *Telecor*: "Some producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products." *Id.* at 1136.

In addition, in the vertically integrated poultry market, a processor with a monopsony need not wait for poultry growers to produce less to increase prices

---

[10] The danger of increased consumer prices is especially acute when the monopsonist resells in a monopolized market. *See* PHILLIP E. AREEDA & HERBERT HOVENKAMP, 3 ANTITRUST LAW: AN ANALYSIS OF ANTITRUST PRINCIPLES AND THEIR APPLICATION § 720a n.1 (2005).

on the wholesale market because the processor also controls the growers' supply. It may simply deliver fewer chicks to the growers, pay them the same low prices, and resell at the same or a higher price. When this happens, both the growers and the end-users are adversely affected. That is, by manipulating prices to suppliers, a monopsonist threatens to injure the end-users. *Id.* at 1136 ("[M]onopsonies fall under antitrust purview because monopsonistic practices will eventually adversely affect consumers."); *id.* at 1134 ("Tenth Circuit case law . . . reject[s] the notion that a monopsony plaintiff must prove end-user impact."); *see also Mandeville Island Farms v. Am. Crystal Sugar Co.*, 334 U.S. 219, 235 (1948) (holding that sugar beet growers had stated a valid monopsony claim under the Sherman Act even though they did not allege end-user impact). Hence, to establish that the practices of a monopsonist have injured or are likely to injure competition, a plaintiff does not have to be a competitor of the buyer or demonstrate that the buyer has improperly excluded other competitors. Instead, the plaintiff must show that the monopsonist's practices have caused or are likely to cause the anticompetitive effect associated with monopsonies, namely the arbitrary manipulation of market prices by unilaterally depressing seller prices on the input market with the effect (or likely effect) of increasing prices on the output market.

As we noted above, shortly after the PSA's passage, the Supreme Court identified these very harms as the reason Congress passed the Act: the "'chief evil'" Congress sought to prevent was "'the monopoly of the packers, enabling

-26-

them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer who buys.'" *Mahon v. Stowers*, 416 U.S. 100, 106 (1974) (quoting *Stafford v. Wallace*, 258 U.S. 495, 514–15 (1922)); *see also Swift & Co. v. United States*, 393 F.2d 247, 254 (7th Cir. 1968) ("The lack of competition between buyers, with the attendant possible depression of producers' prices, was one of the evils at which the Packers and Stockyards Act was directed."); *Bruhn's Freezer Meats of Chicago, Inc. v. USDA*, 438 F.2d 1332, 1337 (8th Cir. 1971) (noting one of the purposes of the PSA was "to assure fair trade practices in the livestock marketing and meat-packing industry in order to safeguard farmers and ranchers against receiving less than the true market value of their livestock"). Although Congress did not intend to "'upset the traditional principles of freedom of contract,'" *see Pickett v. Tyson Fresh Meats, Inc.*, 420 F.3d 1272, 1280 (11th Cir. 2005) (quoting *Jackson*, 53 F.3d at 1458), it did intend to prevent those practices that facilitate the packers' arbitrary manipulation of prices and complete subversion of normal market forces.

Although other circuits have noted that supply contracts between producers and processors of livestock can increase efficiency, they tend to focus on the benefits to the processor, rather than the market as a whole. *See Pickett*, 420 F.3d at 1283 ("[B]eing able to keep its processing plants operating at capacity has increased [the processor's] efficiency."); *IBP, Inc.*, 187 F.3d at 978 (concluding

that the terms of the contracts allowed the processor "to have a more reliable and efficient method of obtaining a supply of cattle"). But even if supply contracts increase a processor's efficiency, they may threaten the efficiency of the relevant market when a monopsony is able to manipulate the market by depressing producers' prices and increasing resale prices.[11] Hence, to demonstrate that a monopsonist has engaged in "unfair practices" under § 202(a), a seller must show that the buyer's practices threaten to injure competition by arbitrarily decreasing prices paid to sellers with the likely effect of increasing resale prices.

After reviewing the record in the case before us, we find that a genuine issue of material fact exists as to whether OK engaged in unfair practices in violation of § 202(a). In particular, we note that the record contains evidence of the classic monopsony injury, namely that OK is depressing the prices it pays the Growers and reselling at inflated prices. If OK does not compete with other buyers and completely controls the supply to its growers, it may be able to manipulate prices by controlling supply and demand. The record contains expert

[11] Although this case does not involve horizontal price-fixing by a group of buyers, OK's alleged practices manipulate the market in a similar fashion: "[M]arket manipulation in its various manifestations is implicitly an artificial stimulus applied to (or at times a brake on) market prices, a force which distorts those prices, a factor which prevents the determination of those prices by free competition alone." *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223 (1940) (explaining price-fixing as a form of market manipulation). Like illegal price-fixing agreements, a monopsonist's use of supply contracts to manipulate the market poses the risk that prices will be determined by artificial, rather than market, forces.

testimony identifying specific practices that are likely to injure competition in this way. For example, when wholesale prices are weak, OK delays delivery of chicks to growers, thereby decreasing the production of broilers by growers and causing prices to rise on the wholesale market (which eventually adversely affects consumers). Growers are also adversely affected because they produce (and therefore sell) fewer chickens. Furthermore, the record contains evidence that the Growers are paid the same under OK's pricing system during periods of reduced production as they are during periods of average and above average production. In other words, OK can decide to reduce production (to reap the benefits of higher prices on the wholesale market), but it does not have to pay its growers the higher prices that a reduction in supply would demand in a competitive market.

We are not suggesting that uncompetitive prices alone are unlawful. Courts have routinely noted that, short of predatory pricing, a monopolist's uncompetitive prices do not violate antitrust laws. *See, e.g.*, *Kartell v. Blue Shield of Mass., Inc.*, 749 F.2d 922, 927 (1st Cir. 1984) ("Ordinarily . . . even a monopolist is free to exploit whatever market power it may possess when that exploitation takes the form of charging uncompetitive prices.").[12] But if a

---

[12] In acknowledging that an insurer could use its market power to "keep prices down," the court in *Kartell* noted that the lower prices the insurer paid doctors for their services did not result in higher consumer prices, 749 F.2d at 930–31, and that both parties "sit on opposite sides of the bargaining table," *id.* at 929 (quotation omitted). We are confronted with a potentially different arrangement in the case before us. The record contains evidence that OK's

(continued...)

monopsonist's uncompetitive prices are a result not solely of its market power, but also of practices that result in complete control of the input (supply) market, the effect of the monopsonist's practices may be an injury to competition. Moreover, although PSA claims against processors for practices associated with supply contracts have not enjoyed much success, these cases are factually different from the one before us. *See Pickett*, 420 F.3d 1272; *IBP, Inc.*, 187 F.3d 974. For example, the producers in these cases did not allege the existence of a monopsony. In addition, the supply contracts guaranteed producers a price tied to market prices, and overall, the arrangements created incentives and efficiencies that benefitted consumers. *Pickett*, 420 F.3d at 1284 ("[I]t was undisputed . . . that marketing agreements are a more efficient means for both meat packers and cattle producers to operate in the market."); *IBP, Inc.*, 187 F.3d at 978 (explaining that the marketing agreements "essentially ensure[] that the potential for undue or arbitrary lowering of prices is eliminated"); *see also Griffin v. Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 827 (E.D. Va. 2002) (granting summary judgment in favor of a defendant packer because the plaintiff producers had not identified any specific practices that violated the PSA).

We therefore conclude that, if the Growers prove that OK engaged in the

_____

[12](...continued)
practices are likely to increase end-user prices. Moreover, the supply contracts with the Growers give OK complete control over the input market (i.e., the chickens available to OK for purchase), leaving the growers with little, if any, ability to bargain.

arbitrary price manipulation described above with the effect or likely effect of depressing prices to the growers and reselling at increased prices, they may establish that OK engaged in unfair practices in violation of § 202(a). We are by no means suggesting that vertically integrated markets will always violate the PSA. Rather, we hold that § 202(a) is violated when a monopsonist engages in specific practices that result in or are likely to result in the anticompetitive effects the PSA was designed to prevent. To prove a violation, the Growers may not rely on the sum total of various practices that individually are not likely to injure competition, but must instead prove that specific practices have caused or are likely to cause injury. *Capitol Packing Co.*, 350 F.2d at 76–77 ("[S]pecified methods of dealing which are not themselves violations of the [PSA] cannot, when added together, become a violation."). Because the record contains evidence that OK may engage in specific practices that are likely to injure competition, we reverse the District Court's grant of summary judgment in favor of OK and remand for further consideration in light of this opinion.

4. Discovery Ruling

Following the District Court's adverse ruling on their PSA claim, the Growers moved the court to reopen discovery for the limited purpose of discovering information regarding the likelihood of an injury to competition. The District Court denied the motion. The Growers argue that, because of the first judge's ruling that such proof is not required and because discovery had closed in

-31-

the interim, the District Court erred in refusing to reopen discovery.

We review a district court's denial of a motion to reopen discovery for an abuse of discretion. *SIL-FLO, Inc. v. SFHC, Inc.*, 917 F.2d 1507, 1514 (10th Cir. 1990). "Under this standard, a trial court's decision will not be disturbed unless the appellate court has a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *Id.* (quotation omitted).

When OK moved for summary judgment on the Growers' PSA claim, it explicitly re-raised the issue in dispute.[13] The Growers therefore had fair warning that the issue was back on the table for resolution. In fact, they addressed the argument in their response to OK's motion. They argued that the law of the case bound the court to the prior ruling, but that in any event they had presented sufficient evidence of an injury to competition to withstand summary judgment. Only when the District Court disagreed with both propositions did the Growers seek to reopen discovery, arguing that they did not have an opportunity to discover the relevant information.

"[T]he Supreme Court has held that, under Fed. R. Civ. P. 56(f), 'summary

---

[13]At this juncture, we would like to note that both parties flouted their duty under this Circuit's rules to include in the record the relevant motion for summary judgment, supporting brief, and response. *See* 10th Cir. R. 10.3(D)(2). Though we are not required to do so, we have obtained copies of the documents. But we advise that in the future the parties diligently adhere to the rules of the Circuit if they wish to avoid unwittingly waiving arguments.

judgment [should] be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.'" *Dreiling v. Peugeot Motors of Am., Inc.*, 850 F.2d 1373, 1376 (10th Cir. 1988) (alteration in original) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)). Rule 56(f)'s protection is not absolute, however, as its protection "arises only if the nonmoving party files an affidavit explaining why he or she cannot present facts to oppose the motion." *Id.* To benefit from the rule, a party "at a minimum must ask the court to refrain from acting on the summary judgment request until additional discovery can be conducted." *C.B. Trucking, Inc. v. Waste Mgmt., Inc.*, 137 F.3d 41, 44 (1st Cir. 1998); *see also Allen v. Sybase, Inc.*, 468 F.3d 642, 662 (10th Cir. 2006) (concluding that a party's "footnote request in its [response] brief for additional discovery time does not pass muster under rule 56(f)"). "[A] party ordinarily may not attempt to meet a summary judgment challenge head-on but fall back on Rule 56(f) if its first effort is unsuccessful." *C.B. Trucking, Inc.*, 137 F.3d at 44. The Growers, with full knowledge that the District Court would be re-evaluating the competitive injury requirement under § 202(a), took no steps to request time for additional discovery; nor did they take steps to fulfill the requirements of Rule 56(f). In such a case, we are not left with a "definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances." *SIL-FLO, Inc.*, 917 F.2d at 1514 (10th Cir. 1990). We note, however, that on

-33-

remand the parties may seek to reopen discovery, and the District Court may, in its discretion, grant such requests.

B.    The Growers' Unconscionability Claim

The Growers claim that the broiler contract is unconscionable because of the gross imbalance of obligation borne by growers.  For example, they point to the fact that the contract guarantees only a single flock of chicks although a grower must raise broilers for at least fifteen years to recoup its investment.  They also note that OK is not obligated to place a minimum number of chicks or flocks with each grower, and growers are obligated to make improvements to chicken houses before OK will place additional flocks with them.

We must first address a threshold choice-of-law question.  Beginning in 1997, OK's broiler contracts included a choice-of-law provision, designating the law of Arkansas as the governing law.  Consequently, in its order granting summary judgment, the District Court held that Oklahoma law governed the pre-1997 contracts and Arkansas law governed the contracts entered into thereafter.

To decide the effect of the contractual choice-of-law clause, we look to the forum state's choice-of-law rules.  *See Dang v. UNUM Life Ins. Co. of Am.*, 175 F.3d 1186, 1190 (10th Cir. 1999) ("A federal court adjudicating state law claims must apply the forum state's choice of law principles.").  Under Oklahoma law, "a contract will be governed by the laws of the state where the contract was entered into unless otherwise agreed and unless contrary to the law or public

policy of the state where enforcement of the contract is sought." *Williams v. Shearson Lehman Bros., Inc.*, 917 P.2d 998, 1002 (Okla. Civ. App. 1995). Because we conclude that the Growers' unconscionability claim fails under both Oklahoma and Arkansas law, we need not decide whether the application of Arkansas law would be contrary to Oklahoma's law or public policy. In reaching this decision, we review the District Court's interpretation of state law de novo. *Steiner Corp. v. Johnson & Higgins of Cal.*, 135 F.3d 684, 690 (10th Cir. 1998) (citing *Salve Regina College v. Russell*, 499 U.S. 225 (1991)).

As an initial matter, the Oklahoma Supreme Court has never addressed whether Oklahoma common law would recognize an affirmative cause of action seeking damages for unconscionability in contract. Nevertheless, Oklahoma's unconscionability standard is so onerous that the Growers cannot meet that standard here. An unconscionable contract is one in which, "at the time of making of the contract, and in light of the general commercial background and commercial needs of a particular case, clauses are so one-sided as to oppress or unfairly surprise one of the parties." *Barnes v. Helfenbein*, 548 P.2d 1014, 1020 (Okla. 1976). "Unconscionability has generally been recognized to include an absence of meaningful choice on the part of one of the parties, together with contractual terms which are unreasonably favorable to the other party." *Id.*

Whether the Growers lacked any meaningful choice is determined by "'all the circumstances surrounding the transaction.'" *Id.* at 1020 n.12 (quoting

*Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 449–50 (D.C. Cir. 1965)). Relevant factors include whether the aggrieved party had a reasonable opportunity to understand the terms of the contract and whether the important terms were hidden "in a maze of fine print" or were "minimized by deceptive sales practices." *Id.* (quotation omitted). Generally, "one who signs an agreement without full knowledge of its terms might be held to assume the risk that he has entered a one-sided bargain." *Id.* (quotation omitted). On the other hand, if there is a gross inequality of bargaining power and the aggrieved party signs a "commercially unreasonable contract with little or no knowledge of its terms, it is hardly likely that his consent, or even an objective manifestation of his consent, was ever given to all the terms." *Id.* (quotation omitted).

Similar principles apply in Arkansas. In assessing whether a contract or a particular provision is unconscionable, the court must "review the totality of the circumstances surrounding the negotiation and execution of the contract," taking into consideration "whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question." *Jordan*, 207 S.W.3d at 535. Importantly, however, "it is [generally] not the province of the courts to scrutinize all contracts with a paternalistic attitude and summarily conclude that they are partially or totally unenforceable merely because an aggrieved party believes that the contract has subsequently proved to be unfair or less beneficial

than anticipated." *Assoc. Press v. S. Ark. Radio Co.*, 809 S.W.2d 695, 697 (Ark. Ct. App. 1991) (quotation and alteration omitted). Indeed, in Arkansas, "parties are free to make contracts based on whatever terms and conditions they agree upon, provided it is not illegal or tainted with some infirmity such as fraud, overreaching, or the like." *Hancock v. Tri-State Ins. Co.*, 858 S.W.2d 152, 154 (Ark. Ct. App. 1993) (en banc).

None of these circumstances are present here. Although the District Court recognized the potential for some inequality of bargaining power, it was not a "gross inequality of bargaining power." The court noted that the availability of the broiler contracts is well-known in the region and has produced a waiting list of people who wish to become growers under the contract—a contract which is available for review prior to engaging in the capital investment needed to become a grower.

The Growers argue that the inequality of bargaining power should not be determined by reference to the availability of contracts and the fact that many people want to become a grower for OK. Rather, they suggest that the court consider whether they lacked any meaningful choice as to the terms of the contract and whether they had an alternative source for obtaining the desired service or product. Although Arkansas case law does suggest that these are relevant considerations, *see Nat'l Union Fire Ins. Co. of Pittsburgh v. Guardtronic, Inc.*, 64 S.W.3d 779, 783–84 (Ark. Ct. App. 2002), the Growers are

incorrect in dismissing the fact that they initiated the contracting process with OK (i.e., OK did not solicit their business) as irrelevant to the analysis.

In *Jordan*, the plaintiff was a landscaper who rented large equipment from the defendant. 207 S.W.3d at 528. The rental agreement contained a boilerplate provision excusing the defendant from liability for the consequences of its own negligence in connection with the rental of the equipment. *Id.* at 531–32. After the plaintiff was injured by the equipment, he sued, arguing that the exculpatory clause was unconscionable and therefore unenforceable. The Arkansas Supreme Court disagreed. The court found no evidence of a "gross inequality of bargaining power" when the plaintiff "sought out the services" of the defendant and "paid for the rental equipment after being shown how to operate it." *Id.* at 536; *see also Barnes*, 548 P.2d at 1021 (applying Oklahoma law, court held that defendant did not behave unconscionably when the plaintiff's representative sought out the defendant to enter into a contract).

Furthermore, the Growers do not suggest that they are unsophisticated parties unable to evaluate the risks of the contract prior to entering into it. And they do not suggest that they failed to read and understand the terms of the contract prior to entering into it or even prior to building the chicken houses. Also worthy of note is that some of the named plaintiffs have been operating under this allegedly "unconscionable" contract for nearly twenty years. Generally, "[t]he fairness or unfairness, folly or wisdom, or inequality of

contracts are questions exclusively within the rights of the parties to adjust at the time the contract is made." *Id*. We therefore affirm the District Court's grant of summary judgment in favor of OK on the Growers' unconscionability claim.

### III. CONCLUSION

Section 202(a) of the Packers and Stockyards Act requires a plaintiff who claims that a defendant's conduct was "unfair" to show that such conduct results in or is likely to result in an injury to competition. Because the record contains evidence that raises a genuine issue of material fact concerning the Growers' § 202(a) claim, we REVERSE the District Court's order granting OK summary judgment on this claim and REMAND for further proceedings consistent with this opinion. The Growers have, however, failed to show that the contracts at issue are unconscionable under state law. Accordingly, we AFFIRM the decision of the District Court granting summary judgment in OK's favor on the Growers' unconscionability claim. In addition, we AFFIRM the District Court's denial of the Growers' motion to reopen discovery, but do so without prejudice to subsequent requests to reopen discovery on remand. We also deny the Growers' motion to file a second supplemental appendix because the document they seek to add was not part of the record before the District Court.

05-7079, *Been v. O.K. Industries, Inc.*

**HARTZ**, Circuit Judge, concurring/dissenting

I join Chief Judge Tacha's thorough and scholarly opinion for the panel except for Part II.A.2, entitled "Interpretation of 'Unfair Practices' under § 202(a)" and Part II.A.3, entitled, "OK's Alleged Violations of § 202(a)." I arrive at almost the same destination regarding statutory interpretation, but through a rather different route. In my view a practice may be "unfair" under § 202(a) of the Packers and Stockyards Act (PSA) even though it causes no competitive injury. In interpreting that provision we owe respect to the longstanding view of the United States Department of Agriculture (USDA), although I would reach the same interpretation even without reference to that view. On the other hand, the majority opinion's conception of *competitive injury*, which I do not share, appears to be broad enough that many, perhaps all, of the practices that could properly be labeled *unfair* would satisfy its competitive-injury requirement. Finally, I would affirm the district court's decision that the Growers failed to provide evidence showing that the practices challenged on appeal were unfair.

## I.      DEFERENCE TO THE USDA

The deference issue in this case is a very interesting one. The majority opinion appears to acknowledge that we would need to grant *Chevron* deference to the USDA's interpretation of PSA § 202(a), 7 U.S.C. § 192(a), if the USDA

had "authority to adjudicate alleged violations of § 202 by live poultry dealers." Op. at 13. *See Chevron USA, Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984) (court should defer in certain circumstances to agency's reasonable interpretation of ambiguous statutory language). Certainly such deference would appear to be required by the Supreme Court's gloss on *Chevron* in *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001):

> [A]dministrative implementation of a particular statutory provision qualifies for *Chevron* deference when it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority. Delegation of such authority may be shown in a variety of ways, as by an agency's power to engage in adjudication or notice-and-comment rulemaking, or by some other indication of a comparable congressional intent.

As the majority opinion correctly notes, the USDA does not have adjudicatory authority over § 202(a) violations by live-poultry dealers. The USDA does, however, have authority to adjudicate § 202(a) violations by packers. *See* 7 U.S.C. § 193. Most of the judicial decisions cited by the majority opinion involved packers, *see, e.g.*, *Armour & Co. v. United States*, 402 F.2d 712 (7th Cir. 1968); *IBP, Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999), so we have the peculiar situation of not granting *Chevron* deference to the USDA in this case but relying on cases in which *Chevron* deference would have been proper.

I confess to having no idea how the Supreme Court would resolve this conundrum. Perhaps it would avoid the issue as I do, by agreeing with the

USDA's interpretation. But at the least I would think that we owe respect to the experience and expertise of the USDA regarding the PSA. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 139–40 (1944). In that regard it is worth noting that 26 years ago a treatise could report that the USDA "has consistently taken the position that in order to prove that a practice violates the broad prohibitions in §§ 202(a) and (b) . . . of the [PSA], it is not necessary to prove predatory intent, competitive injury, or likelihood of injury." 1 John H. Davidson et al., Agricultural Law § 3.47, at 244 (1981). Such a longstanding view of an agency is entitled to more respect than an ad hoc litigating position. *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987) ("An agency interpretation of a relevant provision which conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view." (internal quotation marks omitted)).

In any event, even if the USDA had never addressed the matter, I would interpret the term *unfair practices* as not requiring competitive injury. I am persuaded by the Supreme Court's interpretation of the term *unfair practices* in the Federal Trade Commission Act (FTCA), the relationship between the PSA and that Act, and an early Supreme Court decision explaining the purpose of the PSA.

In *Federal Trade Commission v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972), the Supreme Court construed § 5(a)(6) of the FTCA, 15 U.S.C. § 45(a)(6), which stated in pertinent part:

> The Commission is empowered and directed to prevent persons, partnerships, or corporations . . . from using unfair methods of competition in commerce and unfair or deceptive acts or practices in commerce.

(amended and now recodified as 15 U.S.C. § 45(a)(2)). The Federal Trade Commission (FTC) had held that Sperry & Hutchinson (S&H) had violated the FTCA by attempting "to suppress the operation of trading stamp exchanges and other 'free and open' redemption of stamps." *Sperry & Hutchinson*, 405 U.S. at 234. S&H challenged the resulting cease-and-desist order, and the Fifth Circuit agreed, holding that the FTC could halt only conduct that "violated either the letter or the spirit of the antitrust laws." *Id*. at 235. Before the Supreme Court the FTC did not dispute that S&H's conduct violated neither the letter nor spirit of the antitrust laws; rather, it contended that its authority was not limited to such conduct. *Id*. at 239. The Court held that the FTCA "empower[s] the [FTC] to proscribe practices as unfair or deceptive in their effect upon consumers regardless of their nature or quality as competitive practices or their effect on competition." *Id*.

The prior history of the Court's interpretations of § 5(a)(6) and *Sperry & Hutchinson*'s comments on that history have, as we shall see, particular implications for interpreting the PSA. The original version of the FTCA, enacted in 1914, did not include the language empowering the FTC to prevent "unfair or deceptive acts or practices in commerce"; the Act provided power only to prevent

"unfair methods *of competition* in commerce." Federal Trade Commission Act, Pub. L. No. 63-203, § 5, 38 Stat. 717, 719 (1914) (emphasis added). In 1920 (the year before enactment of the PSA) the Supreme Court, over the dissent of Justice Brandeis, one of the FTCA's drafters, adopted a limiting interpretation of "unfair methods of competition," restricting the covered practices to those "heretofore regarded as opposed to good morals because characterized by deception, bad faith, fraud or oppression, or as against public policy because of their dangerous tendency unduly to hinder competition or create monopoly." *FTC v. Grata*, 253 U.S. 421, 427 (1920); *see Sperry & Hutchinson*, 405 U.S. at 241. Later, in *Federal Trade Commission v. Raladam Co.*, 283 U.S. 643, 649 (1931), the Court made clear that an unfair method must be unfair to competitors. It said:

> [T]he word 'competition' imports the existence of present or potential competitors, and the unfair methods must be such as injuriously affect or tend thus to affect the business of these competitors—that is to say, the trader whose methods are assailed as unfair must have present or potential rivals in trade whose business will be, or is likely to be, lessened or otherwise injured.

Three years later, however, the Supreme Court changed course in *Federal Trade Commission v. R.F. Keppel & Bro., Inc.*, 291 U.S. 304 (1934). As explained in *Sperry & Hutchinson*, 405 U.S. at 242–43, the Court in *Keppel* upheld an FTC cease-and-desist order against a candy marketing scheme on the ground that it "contravened public policy insofar as it tempted children to gamble and compelled those who would successfully compete with Keppel to abandon

-5-

their scruples by similarly tempting children." The marketing scheme "was 'unfair,' though any competitor could maintain his position simply by adopting the challenged practice." *Id*. at 243. *Sperry & Hutchinson* concluded its summary of *Keppel* as follows: "Thenceforth, unfair competitive practices were not limited to those likely to have anticompetitive consequences after the manner of the antitrust law; nor were unfair practices in commerce confined to purely competitive behavior." *Id*. at 244. The Court then noted that the *Keppel* decision's "perspective" of the FTCA "was legislatively confirmed" in 1938 when Congress amended the Act by adding the phrase "unfair or deceptive acts or practices" to the original ban on "unfair methods of competition." *Id*. at 244 (internal quotation marks omitted). The Court thought that the language *unfair or deceptive acts or practices* clearly did not require anticompetitive conduct. *See id*.

To return to the PSA, the original 1921 language of § 202(a) made it unlawful to "Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce." Pub. L. No. 67-51, § 202, 42 Stat. 161. The language "unfair . . . practice . . . in commerce" is the very language construed by *Sperry & Hutchinson* as not requiring an "effect on competition." 405 U.S. at 239. Moreover, the language is part of the same language in the 1938 amendments to the FTCA that *Sperry & Hutchinson* described as "confirm[ing]"

the *Keppel* view that unfair practices under the FTCA were not "confined to purely competitive behavior." *Id*. at 244.

Particularly noteworthy is that the language of PSA § 202(a) more clearly omits a competitive-effect requirement than does the FTCA language construed in *Keppel*. Section 202(a) does not include the phrase "restraining commerce" that appears in other subsections of § 202. *See* § 202(c) ("if such apportionment has the tendency or effect of restraining commerce"); § 202(d) (transferring or reviewing an article "for the purpose or with the effect of . . . restraining commerce"); § 202(e) (doing "any act for the purpose or with the effect of . . . restraining commerce"). And perhaps more striking, § 202(a) does not use the FTCA's language "unfair methods of competition" construed in *Keppel*. Perhaps this failure to adopt the language of the FTCA, enacted seven years earlier, was to avoid the narrow construction of the FTCA by the Supreme Court in *Grata*, decided shortly before enactment of the PSA.

Comparison of the PSA to the FTCA is sensible because the PSA is an offspring of the FTCA. In 1917 President Wilson ordered an FTC investigation of the food industry. *See* Davidson et al., *supra*, § 3.02, at 187. The FTC's report condemned the practices of the meat-packing industry. *See id*. The five largest packers entered into a consent decree under the Sherman Act in 1920, but the PSA was enacted in 1921, presumably because the antitrust laws and the FTCA were deemed inadequate to the task of dealing with the problem. *See id*. at

187–88.  In that light it would be somewhat surprising if "unfair practices" under the PSA had a narrower meaning than "unfair methods of competition" in the FTCA.

Supporting this view is the discussion of the recently enacted PSA in *Stafford v. Wallace*, 258 U.S. 495 (1922), which upheld the PSA's constitutionality.  Some courts have relied on the Supreme Court's statement in that opinion   that "[t]he chief evil feared is the monopoly of the packers." *Id*. at 514.  But the purpose of the PSA was not just to end the packers' monopoly.  The 1920 consent decree should have accomplished that task.  The PSA's purpose was to end the sort of practices engaged in by the monopoly, practices that could certainly be characterized as unfair but could not easily be characterized as restricting competition.  This point is made clear by quoting at length from Chief Justice Taft's opinion for the Court:

> The object to be secured by the act is the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence in the form of meat products to the consuming cities of the country in the Middle West and East, or, still, as live stock, to the feeding places and fattening farms in the Middle West or East for further preparation for the market.
>
> The chief evil feared is the monopoly of the packers, enabling them unduly and arbitrarily to lower prices to the shipper who sells, and unduly and arbitrarily to increase the price to the consumer, who buys.  Congress thought that the power to maintain this monopoly was aided by control of the stockyards.  Another evil which it sought to provide against by the act, was exorbitant charges, duplication of commissions, deceptive practices in respect of prices, in the passage

of the live stock through the stockyards, all made possible by collusion between the stockyards management and the commission men, on the one hand, and the packers and dealers on the other. Expenses incurred in the passage through the stockyards necessarily reduce the price received by the shipper, and increase the price to be paid by the consumer. If they be exorbitant or unreasonable, they are an undue burden on the commerce which the stockyards are intended to facilitate. Any unjust or deceptive practice or combination that unduly and directly enhances them is an unjust obstruction to that commerce. The shipper, whose live stock are being cared for and sold in the stockyards market is ordinarily not present at the sale, but is far away in the West. He is wholly dependent on the commission men. The packers and their agents and the dealers who are the buyers, are at the elbow of the commission men, and their relations are constant and close. The control that the packers have had in the stockyards by reason of ownership and constant use, the relation of landlord and tenant between the stockyards owner, on the one hand, and the commission men and the dealers on the other, the power of assignment of pens and other facilities by that owner to commission men and dealers, all create a situation full of opportunity and temptation to the prejudice of the absent shipper and owner in the neglect of the live stock, in the *mala fides* of the sale, in the exorbitant prices obtained, in the unreasonableness of the charges for services rendered.

The scope of the PSA is further reflected in the accompanying House Report, which states:

> A careful study of the bill, will, I am sure, convince one that it, and existing laws, give the Secretary of Agriculture complete inquisitorial, visitorial, supervisory, and regulatory power over the packers, stockyards and all activities connected therewith; that it is a most comprehensive measure and extends farther than any previous law in the regulation of private business, in time of peace, except possibly the interstate commerce act.

H.R. Rep. No. 67-77, at 2 (1924).

It appears to me that the condemned practices described by Chief Justice Taft are of the same ilk as those that the majority opinion holds are covered by the PSA. Where I differ from the majority opinion in this regard is that I would not describe the injuries caused by those practices as competitive injuries. The majority opinion does not explain how the alleged practices hurt OK's competitors or even how they injure competition among the Growers. The alleged injuries may be caused by the existence of a monopoly. But it is unclear to me how the practices (such as unilaterally decreasing production by delivering fewer chicks to growers) reduce competition among either growers or dealers. If competitive injury were required by § 202(a), I would agree with the district court that the Growers had not presented sufficient evidence of such injury.

Turning to the specific allegations of this case, I depart from the majority opinion in that I would affirm the decision below because the Growers have not presented sufficient evidence to support their claims that the practices at issue on appeal are unfair. My reasons are essentially the same as the majority opinion's reasons for rejecting the Growers' unconscionability claims. The Growers are not existing producers who sought a market for their product and were confronted with OK's take-it-or-leave-it contracts. Rather, they entered into their businesses only after approaching OK and seeking approval to become its suppliers. The terms of the contract were known. The Growers made an informed decision to enter the industry. To the extent that the Growers claim that the contract

misrepresents OK's actual practice, those are deceptive-practice claims; and it is my understanding that such claims are not before us.  Perhaps OK's exercise of its authority under the contract to reduce the number of birds placed with the Growers could be an unfair practice if it were the result of an effort by OK to drive up prices for its products.  But the Growers' briefs on appeal do not allege that any reduction in placement has occurred.